# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 12, 2002 Session

## STATE OF TENNESSEE v. TIMOTHY J. KING

**Direct Appeal from the Circuit Court for Grundy County**
**No. 3315     Buddy D. Perry, Judge**

---

### No. M2001-01880-CCA-R3-CD - Filed May 7, 2002

---

The defendant was indicted for second degree murder, convicted by a jury of the lesser-included offense of voluntary manslaughter, and subsequently sentenced to a term of six years. In this appeal, the defendant contends: (1) the evidence was insufficient to support his conviction; (2) the state improperly cross-examined him concerning his use of illegal drugs; (3) the district attorney committed prosecutorial misconduct in closing argument; (4) the trial court improperly instructed the jury concerning the weight to be given the defendant's testimony; and (5) the defendant's sentence was excessive. After a thorough review of the record, we affirm the judgment of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Philip A. Condra, District Public Defender, for the appellant, Timothy J. King.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven H. Strain and Sherry Durham Gouger, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### TRIAL TESTIMONY

On December 12, 1998, the defendant shot and killed the victim with a blast from a twelve-gauge shotgun. The circumstances surrounding the homicide are disputed.

Acquilla Shrum, the victim's mother and the defendant's grandmother, testified the victim lived with her. She testified that several months prior to the victim's death, she told the defendant

to bring her an old shotgun to hang on a gun rack.  She further stated that on Friday, December 11, 1998, one day prior to the victim's death, the defendant and his girlfriend brought her a shotgun. She informed the defendant that it was not the type of shotgun she desired, and the defendant agreed to retrieve it the following day.  On Saturday, Shrum left at approximately 5:30 p.m. for her daughter's house and was not present when the victim was shot.

On cross-examination, Shrum stated the victim drank "that hundred proof" heavily on Friday, December 11th and Saturday, December 12th; the victim drank "24 hours a day;" since she would not allow alcohol in the house, the victim "trotted in and out all night [and all day] long" procuring it; and she requested the defendant and his girlfriend stay at her house on the night of Friday, December 11th until approximately 10:00 p.m. because the victim was being "really unpleasant."  Shrum additionally stated the defendant placed the shotgun on the gun rack in her bedroom prior to his leaving Friday night; the bathroom door and door brace had no holes in it when she left on Saturday evening; the victim often sat on the end of her sofa wearing a black hat; and she helped raise the defendant and described their relationship as "very close."

Teresa Judkins was the defendant's girlfriend in December of 1998.  Judkins testified she and the defendant brought a shotgun and shells to Acquilla Shrum's home on Friday, December 11th . She further stated they returned to Shrum's house on Saturday, December 12th with the defendant's niece, and while at Shrum's house, the defendant and victim did not "fuss[]."  She, the defendant, and his niece left the residence to eat supper, and after eating, they drove the defendant's niece to her home and returned to Shrum's residence at approximately 6:30 p.m.  She further testified the defendant exited the car, leaving her in the vehicle, and she heard a noise "like something hit my car."  She stated the defendant exited the house, informed her that he had broken a bowl, re-entered the house, and again exited in approximately five minutes holding the shotgun.

Judkins further testified the defendant offered no explanation of why he was carrying the gun; he told her he wanted to show her where his uncles lived; the defendant provided her with directions; and she drove to the first uncle's house, where the defendant exited the car, went inside the house, and returned stating he wanted her to drive to another uncle's house.  When they arrived at their next destination, she and the defendant exited the car, and after staying a short while, they returned to the car.  While she drove down the driveway, the defendant jumped out of the moving car and ran toward the house.  The defendant then fought with his uncle, and his family members duct-taped him to get him under control.

Paul Shrum, an uncle of the defendant and son of Acquilla Shrum, testified he lived approximately one and one-half miles from his mother's home.  Shrum testified that during the late evening of December 12th, the defendant came to his residence apologizing for "some things that had happened in the past and to borrow some money."  He described the defendant as being "wasted" and stated the defendant never mentioned the victim's name.

Medical Examiner Dr. Charles Harlan performed the autopsy on the victim.  Dr. Harlan testified the victim died as a result of a straightly fired shotgun blast to the side of the head, angled

neither up nor down, from a distance of approximately 21 to 36 inches. He stated that the victim exhibited no evidence of defensive wounds. Dr. Harlan stated the victim's blood alcohol level was between 0.28% and 0.34 % at the time of death, and he stated the victim tested positive for marijuana use within 24 hours of his death.

The defendant's uncle, Hiram Shrum, testified the defendant came to his residence at approximately 7:00 p.m. on Saturday, December 12th. Shrum stated the defendant was "fidgety acting" and said "he had done something bad." Shrum further testified the defendant acted more erratically than usual, jumped out of the car, and ran toward Shrum while the car was still moving in the driveway. When Shrum determined he was unable to calm the defendant, he wrestled with the defendant and eventually secured the defendant with duct tape. Shrum recovered one shell casing from the defendant's front pocket, and Shrum's son recovered the shotgun from the vehicle. The defendant was taken to the hospital, and the gun and shell were turned over to law enforcement officers. Shrum additionally stated his brothers discovered damage to the bathroom door several days after officers initially processed the scene.

Shrum testified on cross-examination that the defendant repeatedly said that Acquilla Shrum was dead; when they informed him that she was living, the defendant refused to believe them; and the defendant was crying and very emotional. Shrum opined the defendant was under the influence of an intoxicant.

TBI agent Larry Davis testified the victim's body was slumped over on the couch; all items on the coffee table in front of the victim appeared to be undisturbed; and there were no signs of a struggle. Agent Davis opined the victim was shot in a seated position on the couch. Agent Davis further testified no prints were recovered from a pair of shears found on the floor, and the gun was not processed for prints. During an interview with the defendant, the defendant stated he shot the victim after the victim said he had harmed the defendant's grandmother and attacked the defendant with the shears, threatening his life. Agent Davis testified the defendant said he "hated" the victim for being mean to his grandmother. The defendant never stated the victim shot at him.

On cross-examination, Agent Davis stated officers were summoned back to the scene the following day, after family members found damage to the bathroom door and door jam. They recovered a pellet consistent with the pellets recovered previously.

The defendant testified that he and Judkins brought Acquilla Shrum a loaded shotgun on Friday. Although she stated she did not want it, he placed it on her gun rack, stating he would retrieve it on Saturday. He stated that because the victim was drinking, his grandmother requested they stay with her until approximately 10:00 p. m., and he saw the victim strike his grandmother in the chest.

The defendant testified he and Judkins took his niece out for dinner on Saturday. The defendant stated that after they finished eating, he and Judkins dropped his niece off at her residence and returned to his grandmother's house. The defendant stated he then went inside, leaving Judkins

in the car, and not seeing his grandmother, asked the victim where she was. He said the victim responded he had "gotten rid" of her. The defendant further testified they fought on the couch, until the defendant broke free and went looking through the house for his grandmother. While he was in the bedroom, the victim shot at him; the blast hit the bathroom door; while the victim reloaded, the defendant grabbed a pair of shears and ran toward the victim; a struggle ensued, and the gun accidently went off hitting the victim; and he removed the gun and shell from the scene because his "nerves got all distorted." The defendant stated he then went to his uncles' houses to tell them what had occurred, but he did not recall much of the conversations because his "nerves . . . just went all crazy."

On cross-examination, the defendant explained that his job, where he only worked "on and off," was the source of his nerve problem, and he had been hospitalized a few days prior to the victim's death. The defendant further stated that he had not used drugs nor consumed alcohol on Friday, December 11th or Saturday, December 12th, and had not used drugs on that prior Wednesday or Thursday. When confronted with medical records from his hospital stay, the defendant admitted he tested positive for methamphetamine and had used it earlier that week. He further stated he was unaware that he told the sheriff the victim lunged at him with the shears.

Paul Shrum was recalled and testified for the defense that he previously witnessed the victim, wearing a gun, threaten and argue with Acquilla Shrum. Paul Shrum stated he fought with the victim and threw him off the property. Shrum additionally stated he had seen his mother with blackened eyes where the victim had struck her. Acquilla Shrum was recalled and testified the victim had previously scratched her face and held her by her throat until she fell and passed out.

The jury rejected the indicted charge of second degree murder and found the defendant guilty of voluntary manslaughter.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence is insufficient to sustain his conviction. We respectfully disagree.

## A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. Id. In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

## B. Analysis

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a).

We view the evidence in a light most favorable to the state. The evidence shows the defendant shot the victim. Dr. Harlan testified the pellets traveled straightly, at no angle, from a distance of approximately two or three feet. Furthermore, TBI Agent Larry Davis opined the victim was shot in a seated position on the couch. Acquilla Shrum testified the victim often sat on the end of the couch wearing a black hat; the black hat was found near the body. The crime scene photograph, illustrating the position of the victim's body, allowed the jury to reasonably conclude the victim was shot while seated in his usual position wearing the black hat. Furthermore, there was no evidence of a struggle in the living room near the victim's body.

Defendant insists there were two shots fired, one by the victim into the bathroom door in the direction of the defendant and the other being the shot that struck the victim. The state argues the evidence does not necessarily establish that the victim ever fired at the defendant. Regardless, even if a shot were fired by the victim into the bathroom door, this is not determinative of the issue of self-defense. The issue of self-defense presents a question for the jury's determination, and the jury may reject it. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Here, viewing the evidence in a light most favorable to the state, the jury could have rationally concluded beyond a reasonable doubt that: (1) the defendant shot the victim in a state of passion produced by the victim's statements and conduct; and (2) even if the victim previously fired the gun toward the defendant into

the door, the defendant subsequently shot the victim at a time when the unarmed victim was seated on the couch presenting no threat to the defendant. Thus, the jury could reasonably conclude that the defendant committed voluntary manslaughter and did not act in self-defense.

## II. DEFENDANT'S PRIOR DRUG USAGE

The defendant contends the trial court improperly allowed cross-examination concerning the defendant's prior drug usage. We find no reversible error.

The defendant repeatedly testified on direct examination that he was unable to recall events on the day of the shooting because of his "nerves." He testified that his hospitalization a few days prior to the shooting was due to his nerves, and the cause of his nervous condition was his job as manager of a family store. The defendant denied using any drugs or alcohol on Friday, December 11th or Saturday, December 12th, and he further denied any illegal drug usage on the previous Wednesday or Thursday. The state, over a general objection, questioned the defendant concerning medical records from his hospitalization following the shooting, indicating he tested positive for methamphetamine and amphetamine. The defendant then conceded that he used methamphetamine "[p]robably earlier in the week [prior to the shooting]." In addition, the state questioned the defendant about his "long history of chemical abuse," which the defendant denied.

The trial court allowed this line of questioning but advised the jury as follows:

> The use or non-use of drugs is admissible only as it would relate to the credibility of this witness. It is not substantive proof that he committed the offense in this case, and it cannot be used by you for any purpose other than deciding the credibility of this individual witness.

Defendant argues this evidence was improperly admitted under Tenn. R. Evid. 404(b). However, defendant's initial objection was based on "relevance." Subsequently, he objected to questions about drug usage on the Wednesday and Thursday preceding the homicide as being "too remote." It appears the evidence was not admitted for substantive purposes under Tenn. R. Evid. 404(b), particularly in light of the cautionary instruction given by the trial court.

Regardless, we believe that evidence of defendant's drug usage near the time of the occurrence was admissible for impeachment purposes. "A party may offer evidence that a witness suffered from impaired capacity at the time of the occurrence or testimony." Tenn. R. Evid. 617. Evidence of one's impaired capacity to observe, record, recall or narrate relates to the witness's credibility. *See generally*, State v. Barnes, 703 S.W.2d 611, 617-18 (Tenn. 1985). Impaired capacity is not considered collateral, and extrinsic evidence is generally admissible. Neil P. Cohen, et al, **Tennessee Law of Evidence** § 6.17 [2][d] (4th ed. 2000). Thus, we conclude defendant was properly

questioned as to his impaired capacity near the time of the homicide; it related to his credibility in describing the events surrounding the homicide.

However, we believe questioning the defendant about his "long history of chemical abuse" was improper since it was too remote for impaired capacity evidence. Nevertheless, considering the entire record, we conclude this did not affect the jury's verdict to the prejudice of the defendant. *See* Tenn. R. App. P. 36(b).

## III. CLOSING ARGUMENT

The defendant contests two remarks made by the state in closing argument. The first statement was as follows:

> The [j]udge will also instruct you what weight to give [the defendant's] testimony. When the [d]efendant testifies, you're to judge his testimony like that of any other witness, giving it whatever weight you feel it deserves. He lied. He lied about methamphetamine. General Strain asked him, did you take methamphetamine? No. Take it the day before? No.

At that point, the defendant noted his objection to the closing argument. On appeal, the defendant contends the state's use of the term "lied" was a personal opinion and a misstatement of the evidence. We see no error.

The defendant, on cross-examination, testified he had not used illegal drugs from Wednesday, December 9th to Saturday, December 12th. The prosecutor then impeached the defendant's testimony with records indicating the defendant tested positive for methamphetamine. Although the defendant explained that he used methamphetamine that week sometime prior to Wednesday, the prosecutor's statement that the defendant lied, especially coupled with testimony from other eyewitnesses who opined the defendant was on drugs at the time of the crime, constituted a reasonable inference from the evidence. We do not view the argument as a statement of personal opinion.

The second remark the defendant contends was improper was as follows:

> And they've put on a lot of proof today, ladies and gentlemen, about what a bad guy [the victim] was and they bring poor Miss Acquilla [Shrum] back up here, yeah, she took a warrant out on him and she had trouble with him and he was mean to her back then, and the only reason, the only reason they're bringing that out, ladies and gentlemen, is because they want you all to go back in there and say [the victim] was an S.O.B., and it doesn't matter that [the defendant] killed him.

-7-

The parties must be granted wide latitude in closing argument, provided the argument is "temperate, predicated on the evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). To the extent that this argument crossed the line, we conclude it did not affect the verdict to the prejudice of the defendant. Tenn. R. App. P. 36(b); *see generally*, State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994).

## IV. JURY INSTRUCTIONS

The defendant contends the trial court improperly instructed the jury concerning the weight it should give the defendant's testimony. We respectfully disagree.

An accused is entitled to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). We review a jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. *See* State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997).

On appeal, the defendant alleges the following instruction was erroneous:

The defendant having testified in his own behalf, his credibility is determined by the same rules by which the credibility of other witnesses is determined *and you will give his testimony such weight as you think it may be entitled.*

(Emphasis added). Defendant argues the instruction effectively implied the defendant's testimony is suspect.

The jury charge is verbatim from the pattern jury instructions. *See* T.P.I. - CRIM 42.04 (5th ed. 2000). Nevertheless, reliance upon pattern instructions will not alleviate error if the instructions are inaccurate. *See* State v. Hodges, 944 S.W.2d 346, 354 (Tenn. 1997).

Defendant has been unable to cite us to any authority supporting his position, nor have we found any such supporting authority. We see nothing misleading or inaccurate in the instruction. This issue is without merit.

## V. SENTENCING

The defendant contends the trial court improperly sentenced the defendant to the maximum six-year term and improperly denied alternative sentencing. We respectfully disagree.

## A.  Standard of Review

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness.  Tenn. Code Ann. § 40-35-401(d).  This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances.  State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999).  If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*.  State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

If no mitigating or enhancement factors for sentencing are present, Tenn. Code Ann. § 40-35-210(c) provides that the presumptive sentence for most offenses shall be the minimum sentence within the applicable range.  State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 788 (Tenn. Crim. App. 1991).  However, if such factors do exist, a trial court should enhance the minimum sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors.  Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).  No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record.  State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); *see* Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

Under the Criminal Sentencing Reform Act of 1989, trial judges are encouraged to use alternatives to incarceration.  An especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary.  Tenn. Code Ann. § 40-35-102(6).

In determining if incarceration is appropriate, a trial court may consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant.  Tenn. Code Ann. § 40-35-103(1).

## B.  Analysis

Following the sentencing hearing, the trial court applied sentencing enhancement factors (1), "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;" (8), "a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;" and (9), possession or employment of "a firearm, explosive device or other deadly weapon during the commission of the offense."  Tenn. Code Ann. § 40-35-114(1), (8), (9).  The trial court then applied mitigating factors (2), "[t]he defendant acted under strong provocation;" and (13), "[a]ny other factor consistent with the purposes of this chapter," based on defendant's remorse.  Tenn. Code Ann. § 40-35-113(2), (13).

<u>Sentence Length</u>

Since the defendant was convicted of a Class C felony and was determined to be a Range I standard offender, we must initially presume the three-year minimum sentence is appropriate. *See* Tenn. Code Ann. § 40-35-210(c). The presentence report established that the defendant had at least 16 prior misdemeanor convictions, including six DUI's, three public intoxication convictions, two drug possession convictions and two theft convictions. Additionally, the defendant committed some of these crimes while on probation. The present offense was committed with a firearm. The trial court properly applied enhancement factors (1), (8) and (9). The trial court considered in mitigation defendant's genuine remorse and that defendant acted under "strong provocation," giving "considerably less weight" to provocation.

The trial court properly applied the enhancement factors and weighed them against the mitigating factors. Since the weight to be given enhancement and mitigating factors is left to the discretion of the trial court, *see* <u>Kelley</u>, 34 S.W.3d at 479, we see no reason to disturb the length of sentence set by the trial court.

<u>Alternative Sentencing</u>

Under the law, the defendant is presumed to be a favorable candidate for alternative sentencing. *See* Tenn. Code Ann. § 40-35-102(6). The trial court made no findings regarding confinement/alternative sentencing under Tenn. Code Ann. § 40-35-103(1); therefore, we must review this issue *de novo* without any presumption of correctness. *See* <u>Poole</u>, 945 S.W.2d at 96.

The defendant indeed had a "long history of criminal conduct" consisting of at least 16 prior misdemeanors from 1983 until the present offense. *See* Tenn. Code Ann. § 40-35-103(1)(A). "Measures less restrictive than confinement" have been unsuccessful; defendant has in the past received alternative sentencing, continued with criminal activity, and committed crimes while on probation. *See* Tenn. Code Ann. § 40-35-103(1)(C). The defendant was untruthful in telling the presentence report officer that he had no children, stating he "didn't think it was any of his business." Untruthfulness is an indication of a defendant's lack of potential for rehabilitation. *See* <u>State v. Nunley</u>, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999).

Although we recognize that defendant also exhibited some positive prospects for rehabilitation, we conclude the above factors dictate against alternative sentencing. We decline to disturb the sentence of confinement.

**CONCLUSION**

Accordingly, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE