**STATE of Tennessee, Appellee,**

v.

**James William BARNES, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Dec. 23, 1985.

Rehearing Denied Feb. 3, 1986.

Edgar E. Fleming, Johnson City, James D. Culp, Jonesborough, for appellant.

Gordon W. Smith, Asst. Atty. Gen., Nashville (W.J. Michael Cody, Atty. Gen. & Reporter, of counsel), for appellee.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant was convicted of burglary and felony murder. At the sentencing hearing the jury found three aggravating circumstances, T.C.A. section 39–2–203(i)(2), (5) and (7).

### I.

The victim of this homicide was Molly Hawk, aged ninety-one. She was in good health and lived alone on Unaka Street in Johnson City, Tennessee. Her daughter, Mildred Keys, lived directly behind her mother and their homes were separated by a hedge and the small rear yard of each house.

Mildred Keys testified that she visited with her mother for about one hour after church on Sunday, May 29, 1983. About thirty minutes after leaving her mother's house she departed for Morganton, North Carolina, and did not return to her home until after 1:00 p.m. on Tuesday, May 31, 1983. She went directly to her mother's house and entered the rear door. She saw blood on the kitchen floor, her mother's house shoes, various objects scattered about and the room in disarray. She "froze in her tracks," then backed out, closed the door and went to her home and called the police.

The police found Mrs. Hawk in a small room next to the kitchen, called the junk room in this record. She was barefoot, wearing a one-piece nightgown or housecoat; and it and her face, head, hands and feet were bloody. The chief investigating officer testified it was "ninety-five percent dried blood." She was taken to the hospital emergency room, where she had convulsive seizures, indicative of a brain injury, but no skull fracture was found. Her nose and jaw were fractured and both eyes were swollen shut. Her facial injuries could have been inflicted by blows from a human fist, according to one of the examining doctors. There were multiple bruises about her entire body, her temperature was down to ninety-four, and her blood pressure was unusually low. The doctor who made the initial examination of Mrs. Hawk at the hospital was reluctant to estimate how long it had been since her wounds had been inflicted but eventually said, "At least six hours or longer, and more probably a day or so."

Mrs. Hawk contracted pneumonia on her seventeenth day in the hospital. Doctor White, a pathologist, testified that the pneumonia cleared to some extent but the autopsy revealed a residual abscess in the left lower lobe of the lung and cloudy fluid in the left chest cavity. It was his opinion that the cause of death was "sepsis from the abscess." He defined sepsis as follows:

> Sepsis is the—a condition where a person might have an infection or an abscess in their body. The bacteria produce many poisons or toxins, and the poisons or toxins actually poison the body. You get a lowering of the blood pressure, you get the things that people usually associate with the infectious process. Fever, prostration, eventually, if it—if it gets bad enough you get a lowering of the blood pressure and shock and death.

It was his opinion that the pneumonia was caused by Mrs. Hawk's confinement to bed in a debilitated condition, unable to breath deeply or exercise. Those same conditions plus the pneumonia caused the abscess to form, which in turn brought about the fatal condition of sepsis.

Another pathologist called by the State, Dr. McGhee, who principally examined the brain and could not remember to what further extent he participated in the autopsy,

testified that the traumatic injuries "by themselves would not have killed her."

The telephone wire had been cut at a point inside the house, chest drawers had been pulled out and contents scattered. However, the victim's two daughters and son-in-law testified, and the only items that they reported missing were a pair of pearls, a watch and some earrings. A woman's purse found open on the kitchen table was an heirloom that had belonged to a maternal ancestor and apparently had not been a repository of anything of value.

The investigation soon focused upon two derelicts, defendant Barnes and Raymond Stroupe, who spent a great deal of their time in the jungle down by the railroad tracks, where the hobos, the winos and the Lysol hounds hung out.

On Tuesday morning, May 31, 1983, about 11:00 a.m., before it was known that anything had occurred at Mrs. Hawks' home, Officer Klaus Helfrick testified that he saw Barnes and Stroupe on Adams Street. He stated, "[w]e've picked them up several times on public drunk charges and I just saw them and I just sort of stopped and—"[1]

The officer continued, saying he was just carrying on idle conversation with them during the course of which Barnes came up and put both hands on the window of the car. He noticed that the right hand had an open cut on one of the knuckles, both hands had dried blood on them, and the rest of the knuckles were swollen. The officer asked Barnes what happened to his hand, and he responded that he and Stroupe were in a fight with some blacks in an alley the night before.

An F.B.I. agent who had worked in the field of shoe print and tire tread identification for several years testified for the State. He identified a shoe print that was found on Mrs. Hawk's kitchen floor as having been made by a shoe exhibited at trial that belonged to defendant.

Stroupe testified for the State, depicting an innocent role for himself, and accused defendant of beating Mrs. Hawk with his fists. Defendant testified, casting Stroupe as the murderer, and insisted that Stroupe was wearing his shoes that day and that he saved Mrs. Hawk from receiving further injuries at the hands of Stroupe.

Stroupe testified that he and Barnes drank a small can of Lysol mixed with water down by the railroad tracks and that later he bought two big cans of Lysol. They moved their activities to an old abandoned funeral home on Millard Street. When they finished off the first big can of Lysol mixed with a gallon of water, Stroupe testified, "we was wanting some Kool-Aid to mix it with." Then he switched gears and said that he had eaten breakfast that morning at Guy's Restaurant and that "I can't drink very much whenever I'm eating." He testified that he was tired of that water, couldn't stand the taste of it, but "didn't have no money to get no Kool-Aid with." Barnes said he knew where he could get some money and led Stroupe to the house on Unaka Street. Stroupe claimed, "I had no idea where we was going."

When no one answered the front door, they went to the back door at Barnes' suggestion, according to Stroupe. A lady came to the back door, Barnes grabbed her, shoved her back and started hitting her. Stroupe said, "Please don't kill that woman —you're going nuts—I'm leaving. I ain't havin' nothin' to do with this." Stroupe said he left the house on Unaka and went back to the funeral home. Fifteen or twenty minutes later Barnes arrived with blood all over him and Stroupe told him he was in trouble "if he hurt that poor woman." They got some Kool-Aid someplace and mixed another batch with Lysol. Stroupe noticed that Barnes had a bad cut on his hand. He put a sort of a tourniquet around it and told Barnes "he'd better go to a doctor, it could be broke."

---

1. Whereupon defendant interposed a vigorous objection and moved for a mistrial, which was overruled.

Defendant testified that he and Raymond Stroupe had spent the night in the jungle. They got up Sunday morning, walked to the Jiffy Store, bought a small can of Lysol, mixed it with a gallon of water and drank it. They went to Howard's after it opened at 1:00 p.m., stole two large cans of Lysol and mixed it with water. Sometime that evening Stroupe asked Barnes to "walk up to his grandma's on Unaka to pick up a few things." When they got there, defendant said he was too filthy to go in and would wait outside. He saw a lady open the door and Stroupe enter. He said he smoked a cigarette for about five minutes and then heard someone screaming, "Please don't kill me." He went to the door and saw that Stroupe had the lady against a wall and was hitting her. Barnes went in, cursed and hit Stroupe several times in the teeth and face, and sustained a bad cut on the back of his fist. Stroupe was knocked into another room, but escaped defendant's wrath by crawling through his legs and leaving the house with a bag under his arm. The lady was bloody and unsteady on her feet and still hollering, "Please don't kill me." Defendant assisted her to a chair, assured her she was not going to be killed and left the house. He found Stroupe at the funeral home on Millard Street, told him he was crazy, and slapped him a couple of times. They then resumed drinking Lysol and water. The bag Stroupe had under his arm had costume jewelry in it, and they sold it the next day.

Defendant testified that a few nights before they visited Stroupe's grandma he was passed out in the jungle too close to an open fire and burned his shoes and blistered his feet. Because of this he could not wear shoes for several days thereafter, including Sunday, so that when they went to the house on Unaka he was in his stocking feet and Raymond Stroupe was wearing defendant's shoes.

With both Stroupe and Barnes admitting that they were at Mrs. Hawk's house, the shoe prints' significance would have been minimal but for the F.B.I. agent's testimony that the right shoe had made numerous impressions going in different directions and left slide marks in the blood. From those findings he was allowed to express the opinion that the wearer of that shoe was engaged in a struggle or combat activity. The agent testified that the shoe was a size eleven. The evidence with respect to the actual size shoe that Stroupe or Barnes would require was confused and contradictory but would support the conclusion that both Stroupe's and Barnes' shoe sizes were in the range of eight and one-half to nine and one-half. Stroupe admitted that he had worn a pair of loafers, size eleven.

Steven Keplinger testified for defendant. He was serving a state sentence as a contract inmate of the Johnson City Jail at a time when Stroupe was there in a cell with several other persons. Keplinger testified that when he went to Stroupe's cell and asked Stroupe why he and Barnes "beat up that old woman like that," Stroupe "come straight out and told me that Bill didn't have nothing to do with it, that he did it all. That was his exact words."

## II.

Defendant argues that the State failed to prove any causal connection between his acts and the death of Mrs. Hawks. In *Odeneal v. State*, 128 Tenn. 60, 157 S.W. 419 (1913), the defendant shot the victim who died one month later. The wound was in the lumbar region and an operation was performed which two doctors said was necessary. Defendant insisted that the operation caused the victim's death and that his conviction of voluntary manslaughter could not stand. One doctor expressed the opinion that the bullet wound was the cause of death and the other doctor was of the opinion that the bullet wound contributed or was the remote cause of his death.

Chief Justice Neil, writing for the Court held that:

One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate

agencies dependent upon and arising out of the original cause. 128 Tenn. at 69; 157 S.W. at 421.

In *State v. Roberson*, 644 S.W.2d 696 (Tenn.Crim.App.1982), the victim of a burglary and beating was ninety years old. He was taken to a hospital and treated for his injuries but died approximately three weeks after the beating. The treating physician testified that the immediate cause of death was bronchial pneumonia but related the contraction of the pneumonia to the beating which rendered the victim unable to cough or overcome the disease. Relying upon the principle quoted in *Odeneal*, the Court of Criminal Appeals affirmed defendant's conviction of involuntary manslaughter and we denied permission to appeal.

■ Doctor McGhee's testimony established a direct causal connection between the beating and Mrs. Hawk's contraction of pneumonia and sepsis, the direct cause of death, and there is no merit to this issue.

We find that all of the essential elements of the crime of felony murder in the first degree were proven beyond a reasonable doubt in satisfaction of the requirements of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and T.R.A.P. 13(e).

### III.

■ Defendant says it was error to instruct the jury on felony murder because the indictment only charged premeditated common-law murder. We rejected an identical contention in *State v. Johnson*, 661 S.W.2d 854, 860–61 (Tenn.1983). However, as a matter of fundamental fairness and conservation of trial time, prosecutors should have a separate count charging felony murder if they intend to rely on it at trial. It is a waste of judicial time, both trial and appellate, for lawyers and judges to carry on lengthy colloquies about this issue, as was done in this case and numerous others that we have reviewed.

### IV.

We find no merit to defendant's issues complaining of the admission of a photograph of Mrs. Hawk "at some unknown time, neatly groomed and smiling, holding a pot of flowers"; or of the use of the felony both to convict of first degree murder and to establish an aggravating circumstance, or of the testimony of Klaus Helfrick.

### V.

Defendant asserts that the trial judge erred in limiting the cross examination of Stroupe with respect to his numerous hospitalizations at mental institutions and the extent and nature of his mental illness, if any.

On direct examination Stroupe testified that he was a disabled veteran of the Vietnam War. He had been a machine gunner on a helicopter, had been wounded in action and spent nine months in military hospitals before receiving an undesirable discharge because he was accused of firing upon his lieutenant when the lieutenant came to assist him after he was wounded. He said he had been in shock and had no recollection of that incident.

He admitted that he had two felony convictions for car theft and that he had been charged with second degree burglary of Mrs. Hawk's home. He insisted that the State had made no promises with respect to prosecution of that charge in return for his testimony.

Stroupe testified about getting "black out drunk" on Lysol and water. He estimated he would take "almost a gallon." He then volunteered that it wasn't exactly a black out and then gave an illustration. He said that he would be drinking down by the river in Knoxville, wake up in jail and learn from the arrest warrant or otherwise that he had been picked up on Gay Street. He, however, would have no recollection of having left the river. He admitted that he was an alcoholic but denied using drugs.

Stroupe admitted that he had been to the Watauga Area Mental Health Center a number of times. Still on direct examination he was asked what he went there for

and responded that he had flashbacks of Vietnam, thought helicopters were "landing in our front yard," and one time had cut his throat because he thought he was being shot at by helicopters. He admitted that he had been in the Lakeshore Mental Health Institute in Knoxville a number of times. He was asked if he had been in the state hospital in Chattanooga and responded that he had been there twice, the last time because of his wife's suicide.

On cross examination he admitted that he was questioned by the Secret Service about whether he had threatened to kill the President of the United States and was sent to a hospital in Butler, North Carolina. His version of how that came about was that a witness testified that Stroupe said he would take over the *Press Chronicle* and after that he would take over the United States, "after I killed the man." He was released on medication after a few months in the hospital.

He was then asked if he had not been admitted to the Moccasin Bend Mental Health Hospital in Chattanooga five times. He responded that he only remembered two occasions but that there may have been more. Under further questioning, Stroupe testified that he was there after his wife's suicide because he was contemplating suicide himself. He was asked if he had not reported that he saw his wife talking to him since her death and the hospital found that he was hallucinating. He first responded with a denial and then said he could not remember nor could he remember the date he entered the hospital on that occasion.

At that point, defendant sought to use the hospital records from Moccasin Bend and the State objected on the grounds that the prosecution had not had an opportunity to study the records. The trial judge delayed further cross examination until the next day when he ruled that the records were inadmissible because "the number of times and reasons that Mr. Stroupe was in the hospital are immaterial." He then invited defense counsel to introduce the records out of the presence of the jury.

After the jury returned, defense counsel continued to question Stroupe about whether or not he was hallucinating after his wife's suicide, but his efforts were met by the State's objections, which were sustained by the trial judge, and neither the dates nor other information from the Moccasin Bend records were adduced before the jury.

One of the Moccasin Bend records shows that Stroupe's fifth admission was on December 5, 1983, and that he was reported missing from the hospital on December 23, 1983, having left against medical advice. The trial of this case began one month and one day thereafter, January 24, 1984. The history on Stroupe's admission reads in relevant part as follows:

"Mr. Stroupe is referred for admission by Dr. Gaboy because he had repeated [sic] stated, 'My wife is trying to get me to kill myself.' He said he sees his wife pointing to the wall. Mr. Stroupe had multiple admissions to this facility. His last admission was 2–28–83 and discharge 3–4–83. He admitted to having heard voices lately, his wife talking to him all the time. He also sees his wife laughing and making fun of his being locked up in this hospital. He said his wife killed herself by overdose one month ago. The patient has been decompensating due to non-compliance with medication since two weeks before admission."

The Moccasin Bend records revealed that Stroupe was admitted on February 28, 1983, because he tried to jump in front of a truck. He signed out, against medical advice, on March 4, 1983, approximately three months before Mrs. Hawk was beaten.

He was admitted to Moccasin Bend in September 1980, after having a seizure on a bus, becoming confused and agitated and thinking he was a pilot in the military service. In September 1981, he tried to cut his throat with a butcher knife because his wife threatened to leave, and he was admitted to the hospital. Also in May 1982, he was admitted because he reported visual

and auditory hallucinations and claimed he had swallowed razor blades.

Tennessee has not ruled upon the exact issue presented in this case, to-wit, is it permissible to cross-examine a key accusatory witness in a criminal case as to his mental state or condition, at a time relevant to the events about which he has testified or at the time of trial, for the purpose of impeaching the witness?

In *Walley v. State*, 240 Miss. 136, 126 So.2d 534 (1961), the Supreme Court of Mississippi held that a witness' history of mental disorders was relevant in determining his or her veracity and reversed defendant's conviction because the trial judge refused to allow defense counsel to question the witness about confinement in a mental hospital two years prior to the trial.

In *State v. Wright*, 29 N.C.App. 752, 225 S.E.2d 645 (1976), the court held that the psychiatric history of the State's only eyewitness to the crime was admissible and reversed the conviction because the trial judge held such evidence inadmissible.

In *Reese v. State*, 54 Md.App. 281, 458 A.2d 492 (1983), defendant had sought, without success in the trial court, to probe the psychiatric history of the principal prosecution witness. The defense showed, out of the presence of the jury, that the witness had been hospitalized twelve times because of behavioral problems and had been diagnosed as borderline personality and schizophrenic, but was denied the right to cross examine with respect to those hospitalizations. The Maryland court noted the relevance of *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), wherein the United States Supreme Court declared that under the Sixth Amendment the cross-examiner is not only permitted to delve into a witness's perceptions and memory, but has traditionally been allowed to impeach and discredit the witness. The court also noted the caveat in *Davis* that the right of cross examination is circumscribed by the trial judge's discretion in preventing repetitive and unduly harassing interrogation.

In *Reese* the key prosecution witness had been hospitalized "in the last several years" and at one time between the robbery and the trial. The records revealed that he had had a history of drug abuse and frequent psychotic episodes.

The *Reese* court, after reviewing a number of cases touching the issue, including *Davis*, said:

> What is referred to as a 'broad discretion' of the trial judge, upon examination, becomes a rather narrow one. The right to discredit an accuser being one of constitutional dimension, *Davis, supra,* can be but limitedly circumscribed.
>
> . . . .
>
> The 'discretion' then, between the defendant's right to discredit testimony and the trial judge's duty to protect a witness is solely one of relevance of the questions to the witness's credibility. The relevancy test at this juncture does not regard the elucidation of one of the main issues at trial, it is whether the answer elicited will be a useful aid to the court or jury in appraising the credibility (not necessarily the veracity) of the witness and in assessing the probative value of his direct testimony. 458 A.2d at 496.

In remanding for a new trial, the *Reese* court cautioned that defendant's suggestion that the entire record of each admission should be presented to the jury for whatever value it had was an absurdity and stated that the inquiry had to be carefully limited to that which was relevant to credibility.

Our research discloses that since *Davis* a number of cases have held that a particularly wide scope of examination must be allowed in criminal cases when the witness is crucial to the prosecution. *See e.g. United States v. Lindstrom*, 698 F.2d 1154 (11th Cir.1983); *Greene v. Wainwright*, 634 F.2d 272 (5th Cir.1981).

■ We think it appropriate to adopt and apply the foregoing principles to the issue before us with the caveat that they are limited to key prosecution witnesses in criminal cases and the evidence of mental

instability must be shown to have existed within a reasonable time of the events about which the witness testifies or within a reasonable time before the testimony is given.

■ Applying those principles to this case, it is clear that the February 1983 hospitalization, three months before the criminal episode, and the December 1983 hospitalization, one month prior to Stroupe's testimony, were relevant because facially they indicated mental instability that might reasonably be expected to affect the witness' contact with reality and his ability to recall events accurately within a time frame relevant to the crime and to his trial testimony. However, the only information in those records that we find relevant for use in cross examination are the admission dates, the history on admission, the admitting diagnosis, the discharge dates and that the discharge in each case was against medical advice.

It was certainly relevant and material to the defense to have before the jury the dates of admission and discharge of the February and December 1983 hospitalizations because during Stroupe's direct examination no reference to the episodes of instability that he testified about were accompanied by dates. Instead the general impression was left that they were the result of the distress of a war fifteen years ago and were not contemporaneous with the criminal episode about which he was testifying.

■ Having found error in the failure to allow use of the hospital records in the cross examination of Stroupe, we are confronted with the issue of whether that error was harmless beyond a reasonable doubt. We find that it was harmless beyond a reasonable doubt.

A rational analysis of the entire record in this case compels the conclusion that Stroupe and Barnes were engaged upon a joint criminal venture with equal or near equal culpability in its origination and execution. There was no plotting, planning or premeditation on the part of Barnes or Stroupe, beyond stealing money or property of sufficient value to buy Kool-Aid. Both testified that they had consumed their second gallon of Lysol and water, and Stroupe said "about a gallon" would result in a blackout drunk condition for him. It is reasonable to assume that Barnes would be close to that condition. Thus, it is doubtful that either of them could accurately recall what happened at Mrs. Hawk's house. But, be that as it may, each has told a story of joint companionship, right up to the entry into the house on Unaka, where each immediately assumes an innocent, disapproving role. But, immediately after the criminal episode is over, they resume their joint companionship, sharing the fruits of the burglary and converting them to their original objective, Kool-Aid to sweeten the Lysol brew.

In addition to the evidence heretofore detailed pointing to Barnes as the principal actor in the murder of Mrs. Hawk, the testimony of Robert Holt, an F.B.I. seriologist, was also significant. An analysis of blood samples revealed that defendant's blood type was O, 1–1; Stroupe's was O, 2–1 and the victim's was A. Blood of the type matching defendant's was found on the dining room floor, the kitchen floor and the junk room floor where the victim's body was found. No blood type matching Stroupe's was found in the victim's house.

It is our opinion that if a jury found Stroupe totally lacking in credibility, the evidence would be sufficient to convict Barnes of first degree felony murder beyond a reasonable doubt. Thus, the error was harmless beyond a reasonable doubt.

## VI.

■ Defendant raises two issues involving the sentencing phase of the trial. He insists that having been convicted of felony murder at the guilt phase, double jeopardy precludes the use of the felony as an aggravating circumstance. We have heretofore considered and rejected this identical issue. *See State v. Laney,* 654 S.W.2d 383 (Tenn.1983); *State v. Prichett,* 621 S.W.2d 127 (Tenn.1981).

Defendant asserts that the District Attorney, "immediately begins to compare and contrast the instant case with other cases, and therefore invites the jury to consider matters which are outside of the proof introduced in this case." The argument complained of was as follows:

The Court: Ready for your argument, General?

General Mooney: Yes, Your Honor. Ladies and gentlemen, my brevity at this time is in no way indicative of very deep and very strong feelings that I have at this time. I do not make it a practice to stand before juries or tell the press before trial, making any noise over this thing that you hear about all the time, the Assistant D.A. said he was going to ask for the death penalty. As you will hear the law charged to you by His Honor, that is your decision, and I would not attempt to in any way influence that decision by making noises that we are asking for the death penalty. However, in this case as a representative of the people, I feel that I am totally and completely—

Mr. Fleming: Your Honor, I object—

General Mooney: —obligated—

Mr. Fleming: I am sorry. I feel like I have to object.

Defendant's motion for a mistrial, as well as his objection, was overruled by the trial judge and no corrective action was taken.

Perhaps the District Attorney did intend to embark upon a comparison of this case with other cases, but at the time of the interruption it was not clear what he might say and to that point he had said nothing improper or harmful to defendant. Defendant's objection and motion, even though overruled, effectively forestalled any possible error and there is no merit to this issue.

We have concluded from our review of the record, the briefs and the oral argument that the evidence of defendant's guilt fully satisfied the standard prescribed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and T.R.A.P. 13(e). We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205(c) and are satisfied that the evidence warranted imposition of that penalty.

The sentence of death will be carried out on the 17th day of March, 1986, unless stayed by appropriate authority.

Costs are adjudged against defendant.

COOPER, HARBISON, DROWOTA, JJ., concur.

BROCK, C.J., dissents.

BROCK, Justice, concurring in part; dissenting in part.

With respect to the constitutionality of the death penalty, I adhere to the views expressed in my dissenting opinion in *State v. Dicks,* Tenn., 615 S.W.2d 126, 132 (1981); in all other respects I concur in the opinion of the Court.

OPINION ON PETITION TO REHEAR

Defendant complains that we failed to respond to issue number five in his brief, to-wit, that defendant should have been granted a mistrial following the testimony of Officer Helfrick.

We noted in the main opinion that defendant moved for a mistrial after Officer Helfrick said defendant and Stroupe had been picked up several times on drunk charges. The officer was responding to the District Attorney's question: "Any particular reason that you stopped and talked to them?"

In response to defendant's objection and motion for a mistrial, the trial judge instructed the jury not to consider the truth of the statement that defendant and Stroupe had been involved in drunk charges, but to consider it only for the explanation of why they were stopped.

The two actors in the murder of the victim, defendant and Stroupe, both depicted themselves as derelicts whose principal activity was the pursuit of any substance that would intoxicate them. In light of the evidence in the record of numerous occa-

sions when both had been drunk which was not detailed in the opinion, the response of Officer Helfrick that they had been picked up several times on drunk charges was insignificant. The question should not have been asked, but we find beyond a reasonable doubt that the answer did not prejudice defendant. The insistence that this error was a ground justifying a mistrial has no merit.

Defendant questions our interpretation of the testimony of Doctors White and McGhee, re-arguing his insistence that no causal connection was established between the beating of the ninety-one year old victim and her death more than seventeen days after her battered body was found and removed to the hospital. We have re-read the testimony of the two doctors and are satisfied that we have correctly dealt with that issue in the main opinion.

At defendant's insistence we have also reconsidered our finding that the trial judge's error in refusing to allow defendant to use in cross examination certain portions of the hospital records was harmless. While errors in this category and the error of far lesser magnitude chronicled above are disturbing to this Court, particularly in a case where the death penalty results, we affirm our finding that those errors separately and collectively, were harmless beyond a reasonable doubt.

The petition to rehear is denied.

BROCK, C.J., COOPER, HARBISON and DROWOTA, JJ., concur.