# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 6, 2006

## STATE OF TENNESSEE v. ANTHONY M. BOND

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-03095      Joseph B. Dailey, Judge**

---

**No. W2005-01392-CCA-R3-CD  - Filed September 20, 2006**

---

The defendant, Anthony M. Bond, was convicted of first degree felony murder. See Tenn. Code Ann. § 39-13-202(a)(2) (1997). The jury returned a verdict of life without parole. See Tenn. Code Ann. § 39-13-204 (1997). In this appeal as of right, the defendant argues that (1) the evidence was insufficient to support a conviction for felony murder because the facts and circumstances of the underlying robbery were not the proximate cause of the victim's death; (2) the trial court erred by denying the defendant's request for a curative instruction after the prosecution stated in its closing argument that the jury had been sequestered because of the defendant; (3) the trial court erred by allowing the introduction of testimony concerning the defendant's teeth; and (4) the trial court erred by allowing the prosecution to bolster an expert witness's credibility. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

James E. Thomas, Memphis, Tennessee (on appeal), and Howard B. Manis, Memphis, Tennessee (at trial), for the appellant, Anthony M. Bond.

Paul G. Summers, Attorney General & Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Nicole Germain, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

On April 21, 1997, the defendant and a co-defendant, Andrew Thomas, robbed an armored truck guard outside of a Walgreens in Memphis. Thomas shot the victim, James Day, in the back of the head and grabbed the money bag. Both men fled in a stolen car. After being tried and convicted for felony murder, the defendant appealed and this court concluded that the failure of the trial court to instruct the jury as to the lesser included offenses of felony murder qualified as

reversible error and warranted a new trial.[1]  The defendant was convicted of first degree felony murder at his second trial, which is the subject of this appeal.  He had previously pled guilty to robbery in the United States District Court.

Betty Gay, the head cashier and sixteen-year employee at the Walgreens, testified that as she returned from her lunch break at exactly 12:37 p.m., she saw the victim, a Loomis Fargo courier, waiting to pick up a deposit.  She explained that she knew the victim because he had regularly picked up deposits from her store and recalled saying, "Have a nice day," as he left.  Ms. Gay heard a gunshot and then saw an African American male, wearing a blue jacket and khaki pants or shorts and in possession of the money bag, run from the scene toward Novarese Road.

Charles Young, an assistant manager at the Walgreens, testified that the shooting occurred on a Monday, the biggest deposit day of the week.  He recalled that he had given the victim about $19,000 in cash and another $9,000 in food stamps and checks just before the shooting.  According to Young, a cashier yelled for someone to call the police and when he ran outside, the victim, who was lying in a pool of blood, "just kept repeating, I need to call my wife, I need to call my wife."  Young testified that Walgreens had a surveillance camera on a twenty-four hour lead that recorded the victim being shot.

The videotape was played for the jury.  Memphis Police Lieutenant Darren Goods, whose primary role in the investigation was to analyze the tape, slowed its speed so that he could view individual frames, which he then printed out as photographs.

Christopher Sains worked for a commercial driving company and delivered Coca-Cola products to the Walgreens on the afternoon of the shooting.  While he was unloading the shipment from his truck, which was parked behind the Walgreens, he heard squealing tires and saw a white four-door car occupied by two men speed out of the parking lot.  The car came to a halt behind a red car that had been parked along the street and two men emerged from the vehicle, entered the red car, and again sped off.

Gary Craig, who lived directly behind the Walgreens, testified that when he heard tires screech, he ran outside and saw an African American man get out of the driver's seat of the white car and into the front passenger seat of the red car.  Craig testified that there was only one occupant in the white car when it came to a stop and recalled that the windows of the red car were too tinted to see inside.

Later, on the same day of the shooting, the defendant's girlfriend, Tanya Monger, purchased a 1990 Chevrolet Caprice for $4,500.  She paid cash.

---

[1]This court affirmed the first degree murder conviction and death sentence of the co-defendant Thomas. Because the trial court failed to properly instruct the jury on lesser included offenses, this court granted a new trial for the defendant in State v. Bond, No. W2001-02710-SC-R11-DD (Tenn., at Jackson, Aug. 30, 2004); our supreme court denied application for permission to appeal.  In State v. Thomas, 158 S.W.3d 361(Tenn. 2005), our supreme court affirmed the conviction and sentence of the co-defendant.

Angela Jackson, the ex-wife of the co-defendant Thomas, testified for the state. She recalled that at the time of the shooting, Thomas typically spent his nights at her apartment and used her red Suzuki Swift for transportation. She stated that on the morning of the shooting, Thomas left in her car, explaining that he was going to meet the defendant. She testified that shortly after noon, Thomas and the defendant banged on her door and appeared to be "hyped" as they entered her residence. She stated that the defendant threw "envelopes and stuff" on the floor and that the two men counted the money, checks, and food stamps that were in the envelopes. Ms. Jackson recalled that the defendant told her that they needed to "keep it a secret" and remembered that Thomas told the defendant to get rid of a silver gun. She testified that the defendant left with the gun and his share of the money and that Thomas and her two daughters traveled to a car dealership where they purchased a pink Chevrolet for him. She stated that he insisted that she and her two daughters stay with him at a hotel that night and recalled that while at the hotel, she saw the television report on a shooting at a local Walgreens. Ms. Jackson testified that when the report suggested that the victim had struggled for his life, Thomas remarked that "the news thing was lying, that he [just] grabbed the n----- by his head and shot him." When questioned as to why she cooperated with the defendant and co-defendant, Ms. Jackson said, "I was afraid, so I did whatever I thought I could to be safe." She also remembered that prior to the shooting, when Thomas saw armored trucks on the road, he would frequently comment, "I got to get that money." Ms. Jackson identified Thomas as the man in the photograph stills captured by the Walgreens surveillance camera. She recalled that Thomas described the defendant as "shaky" and pointed out that he "wasn't a killer."

Carol Wilson reported her father-in-law's car as stolen on the morning of the shooting. She testified that a white Pontiac Bonneville, which had been parked at his apartment complex at 8:00 p.m. on the night prior to the shooting, was discovered as missing at 7:00 a.m. on the next day.

Memphis Police Sergeant Robin Hulley dusted the Pontiac Bonneville for fingerprints. She lifted a latent fingerprint from the passenger side rear door just beneath the door handle. The parties stipulated that "the fingerprint lifted from the white Pontiac Bonneville by Sgt. Robin Hulley . . . and forwarded to latent print examiner, Jerry Sims, was examined by [Jerry Sims] and does belong to [the defendant]."

Richard Roleson, a retired Memphis police officer, investigated the robbery and shooting of the victim. He testified that about six months after the crimes, he interviewed the defendant and found him to be cooperative. The officer denied making any threats or coercing the defendant into giving a statement. Officer Roleson took the following statement wherein the defendant admitted his participation in the robbery:

Me and [Thomas] was talking the day before the robbery, Sunday. He said something about armored trucks and said, "Do you want to rob one?" I said. "Yeah." Then me and [Thomas] [were] talking about where to do it at, where they be at. And we just said either on Summer or Jackson where we always see them. So then we got a stolen car, I got the car from Poplar Plaza. Then parked it. Then the next day . . . [Thomas] came to pick me up from my mama's house in a little red car, that belonged

to his girlfriend, [Ms. Jackson]. Then I got the stolen car . . . and I drove it to Walgreens. We both got in the stolen car and we left the red car around the corner from Walgreens. Then a[n] armored truck pulled up in front of Walgreens, [Thomas] got out and shot him, the guard. [Thomas] got the money and got back in the car and we drove around the corner and switched cars. We drove to his girlfriend's house . . . . and split the money up. I called a ride and left.

According to the officer, the defendant claimed that he did not know that Thomas was going to shoot the guard, that Thomas had told him that "he was just going to pull [a gun] on him and take his gun and get the money." While admitting to Officer Roleson that he had possession of a weapon when he left the Jackson residence, the defendant claimed that he immediately gave it to Thomas and asserted that the checks and food stamps that were in the stolen money bag were thrown away along with the clothes they wore during the robbery. The defendant stated to the officer that he received about $6,000 or $7,000 as his share from the robbery. He informed him that he used $4,800 to purchase a white 1990 Chevrolet Caprice and titled the vehicle in the name of his girlfriend, Tanya Monger.

Treveous Garrett, who had been introduced to the defendant through Ms. Monger, testified that the defendant and a man by the name of Keith Echols picked her up and drove her and Ms. Monger to the mall, where the defendant purchased a necklace, a ring, and a pair of shoes. She recalled that the defendant had given her $600 or $700 cash and had also handed Ms. Monger some cash. Ms. Garrett stated that the four of them then drove to a car lot where the defendant purchased a white car in the name of Ms. Monger. She recalled that on the next morning, she accompanied the defendant to a dentist's office, where his teeth were filed in preparation for gold caps.

Faye Day, the wife of the victim, an armored car courier for Loomis Fargo, testified that at 5:00 a.m. on the morning of the shooting, the victim left for work "healthy as a horse." She recalled that just after noon, someone at the hospital telephoned and informed her that her husband had been shot. Ms. Day testified that the victim had surgery to release fluids from his head but suffered a stroke and afterwards was unable to use his arms or legs. Doctors performed several surgeries on the victim, who eventually was moved to a rehabilitation center. While at the rehabilitation center, the victim had a feeding tube inserted. His home was renovated in order to accommodate his needs. The victim never regained control of his bowels, required constant attention, was depressed, and was always in pain. Some two years after the shooting, a physician inserted a "leave in" catheter in an attempt to relieve some of the workload required of Ms. Day, who was a certified nursing assistant. In September of 1999, Ms. Day noticed some blood in her husband's catheter bag and hours later doctors discovered that his bladder had burst and that he had developed an infection known as sepsis. The victim died two days later.

Assistant United States Attorney Tony Arvin testified for the state that the defendant pled guilty to robbery in the United States District Court and had acknowledged "being there and participating in the events" involving the victim.

-4-

Tanya Monger testified that the she was at Ms. Garrett's residence on the day of the shooting and that the defendant and Keith Echols drove them to the mall where the defendant purchased a $1,500 herringbone necklace and a pair of shoes. She recalled that they then traveled to a car dealership where the defendant paid $4,800 in cash for a car, which he put in her name. She remembered that she went twice to the dentist's office with the defendant, the first time so that he could get his teeth filed and the second time to get four gold teeth put in. One gold tooth had a dollar sign on it, another had the letter "A," and another had the letter "B." According to Ms. Monger, she and the defendant were watching the television show "Cops" when he admitted that he had robbed an armored truck. She recalled that when she asked him to "quit playing" because she would have to inform the police, he claimed to have just been joking.

Dr. O.C. Smith, the Shelby County Medical Examiner, testified that the victim died "as a result of sepsis, secondary to a ruptured neurogenic bladder, and gunshot wound to the head." He described sepsis as "an overwhelming body infection that is caused by a bacteria that escapes from a localized area, and gets in the bloodstream, and infects many of the body's tissues." According to Dr. Smith, the victim's gunshot wound caused bleeding and blood clots that resulted in paralysis, which, in turn, caused his bladder to become "very fragile" and rupture. During the autopsy, Dr. Smith did discover that the victim had ninety percent blockage in one of his arteries, a fatty liver, and damaged kidneys, but it was his opinion that none of these conditions caused the victim's death. The doctor was also of the opinion that the victim's death was not the result of Ms. Day's failure to properly clean his catheter. He testified that the victim had been very well cared for based on the lack of bed sores on his body.

On cross-examination, Dr. Smith acknowledged that after the shooting, the victim's doctors were concerned with blood clots and that one of them prescribed Coumadin, a blood thinner. He also confirmed that although the victim had been paralyzed from his chest down, he had regained use of his arms. Medical records indicated that the victim was able to walk with the aid of a rolling walker and "standby assistance" for distances of up to forty feet by the end of his physical therapy. Records suggested that the victim might be capable of returning to work at a "sedentary level."

Dr. Smith confirmed that the hospital had issued a death summary identifying the final diagnosis as urosepsis, which is sepsis that originates in the urinary tract; that a second diagnosis on the summary was "intra-abdominal bladder rupture"; that the third was "New Onset Diabetes Mellitus," or high blood sugar; and a fourth diagnosis was listed as "Coumadin toxicity." Dr. Smith explained that Coumadin toxicity can result in making a person's body "much more prone to bleed internally." It was his view, however, that Coumadin did not cause sepsis. Also listed in the summary was a fifth diagnosis of "paraplegia secondary to gunshot wound." Dr. Smith diagnosed the victim as having died as a result of sepsis, ruptured neurogenic bladder, gunshot wound to the head, "remote," visceral congestion, and visceral petechiae. He explained that he used the term remote because "the gunshot wound occurred at some time sufficient in the past, and it ha[d] healed, and that the immediate effect of being shot ha[d] passed." He conceded that determining a cause of death is not an "exact science" but maintained his opinion that the death "related back to . . . the delayed effects of the gunshot wound."

The defense did not offer any evidence.

I.

The defendant first argues that the evidence was insufficient to support his conviction because the state failed to establish that his actions were the proximate cause of the victim's death. Specifically, he contends that the victim's death was due to an intervening medical condition. The state submits that the evidence was sufficient.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1997). In order to sustain a criminal conviction for homicide, the evidence must establish that the defendant's actions or conduct caused the requisite harm. Generally, this is established by showing that the victim's death was the natural and probable result of the defendant's unlawful act. See State v. Barnes, 703 S.W.2d 611, 614-15 (Tenn. 1985), cert. denied, 476 U.S. 1153 (1986); State v. Randolph, 676 S.W.2d 943, 948 (Tenn. 1984); Letner v. State, 299 S.W. 1049, 1051 (1927); Copeland v. State, 285 S.W. 565, 566 (1926); Odeneal v. State, 157 S.W. 419, 421 (1913). In Odeneal, our supreme court established the general rule on the issue of causation:

> One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause.

157 S.W. at 421; see also Barnes, 703 S.W.2d at 615 (quoting Odeneal). This causal chain may, however, be broken. In Letner, our supreme court discussed the relevance of intervening or superseding acts:

> "Where it appears that the act of the accused was not the proximate cause of the death of the person for whose murder he is being prosecuted, but that another

cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a good defense to the charge of homicide." [13 R.C.L. 750.]

[But] . . . "whenever an independent responsible person, disconnected with the defendant, causes some intervening act to be done, the defendant is relieved of responsibility for the consequences thereof, unless the act of intervention is the natural result of the defendant's act."

. . . .

"The unlawful act or omission need not be the sole cause of death. Thus if defendant's negligence was a cause of the death, it is immaterial that the negligence of the deceased himself or of others also contributed thereto. If an injury caused by defendant contributed to the death, defendant is responsible, although a subsequent mortal wound inflicted independently by another also contributed thereto. Defendant's act or omission need not be the immediate cause of death; he is responsible if the direct cause results naturally from his conduct. The same is true if the direct cause is an act of the deceased himself reasonably due to the defendant's unlawful conduct."

. . . .

In other words, the defendant cannot escape the consequences of his wrongful act by relying upon a supervening cause when such cause naturally resulted from his wrongful act.

299 S.W. at 1050-51 (emphasis added) (quoting Corpus Juris).

In order for the defendant to be insulated from criminal responsibility, the death must be so "unexpected, unforeseeable or remote" that the defendant's actions could not legally be the cause of the death. See Randolph, 676 S.W.2d at 948. Generally, our courts have held this to be a factual issue to be determined by the trier of fact based upon the evidence introduced at trial. Id. Here, that would clearly support the position of the state.

The defendant does not dispute that he participated in the robbery or that the victim was shot during the robbery. Indeed, he pled guilty to the robbery in federal court. The defendant, in this appeal, simply argues "that the facts and circumstances of the underlying robbery were not the proximate cause of [the victim]'s death."

Initially, the defendant has failed to cite any authority in support of his argument. The failure to cite authority in support of an issue may constitute a waiver. Tenn. R. App. P. 27(a)(7). In any event, the defendant is not entitled to relief. Dr. Smith testified that the victim's gunshot caused his paralysis which caused his bladder to become fragile and rupture. While acknowledging that he could not state with certainty whether the victim developed sepsis before or after his bladder ruptured, he steadfastly maintained that the victim's death "related back to . . . the delayed effects of

the gunshot wound." There was no evidence to the contrary. Under these circumstances, it is our view that the evidence was sufficient to support the conviction.

## II.

The defendant next contends that the prosecutor made an improper remark during her closing argument which required a curative instruction to the jury:

> None of us would be here, none of you fine people would have been sequestered this week and away from your friends and families, away from the comforts of your home, that [evidence] cart wouldn't be there, all these boards, all these pieces of paper, all these people, this machinery, none of it would [be] here except for [the defendant].

The state argues otherwise and contends that the defendant failed to demonstrate that the statement could have affected the verdict to the prejudice of the defendant.

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. Sparks v. State, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court articulated the following factors to be considered in making that determination:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper statements;
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
> (5) the relative strength or weakness of the case.

539 S.W.2d at 344.

Most restrictions during final argument are placed upon the state. That is based in great measure upon the role of the prosecutor in the criminal justice system:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As

-8-

such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed.  Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Judge, 539 S.W.2d at 344-45.  Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial.

This court has observed that there are five generally recognized areas of prosecutorial misconduct related to closing argument:

1.  It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
2.  It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
3.  The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
4.  The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
5.  It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

During her rebuttal argument, the assistant district attorney apologized to the jury for their sequestration during the trial and argued that none of the time and trouble of the trial would have been necessary except for the defendant.  In a bench conference, defense counsel objected, submitting that the statement was "completely inaccurate" and pointing out that the sequestration was at the insistence of the state.  The trial court found that the statement, in context, was made as "part of a larger statement that none of us in the courtroom, none of the exhibits, none of the processes, would be in motion except for him."  A request for a curative instruction was denied.

It is our view that the argument, when taken in context, did not place upon the defendant the full responsibility for the sequestration. Instead, the state appears to be blaming the defendant for the criminal acts which led to the "time and trouble" of trial. Our constitution, of course, guarantees every individual the right to a trial by jury. Tenn. Const. art. I, § 6. A jury should never be asked to place the accused in a less favorable light simply because the right was exercised. Cf. State v. Hale, 672 S.W.2d 201, 202 (Tenn. 1984) (holding that "any adverse comment upon the failure of a defendant to testify in his own behalf, made by the state's attorney in his argument before the jury, constitutes reversible error" if a curative instruction is not given). The remark was improper. In response to the request for a curative instruction, the assistant district attorney concluded that the defendant was not the cause of the sequestration and explained that she had made the statement only in the context of the entire trial. Either way, the comment should not have been made. Prosecutors should refrain from any argument which might divert the jury from its duty to decide the case only on the evidence. See Goltz, 111 S.W.3d at 6. In our view, the trial court should have provided curative instructions. Nevertheless, the state presented a particularly compelling case against the defendant. The defendant pled to the underlying robbery and questioned only the cause of death, which was not challenged by the presentation of any evidence. The strength of the case could have hardly been greater. No other errors in the record compound this error. By the application of all of the factors set out in Judge v. State, it is our assessment that the argument did not affect the verdict.

III.

The defendant next argues that the trial court erred by allowing irrelevant, prejudicial testimony concerning the inscriptions on the defendant's teeth. The state submits that the testimony was relevant and that any error would have been harmless because the defendant had already displayed his teeth to the jury.

Generally, the admission of evidence is a matter entrusted to the sound discretion of the trial court, and a trial court's ruling on an evidentiary matter will not be reversed absent abuse of that discretion.[2] State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)). On appeal, "[t]he abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)); see also State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In State v. Forbes, 918 S.W.2d 431 (Tenn. Crim.

---

[2]Donald F. Paine, adjunct professor at the University of Tennessee College of Law and reporter to the Tennessee Supreme Court Advisory Commission on Rules of Practice and Procedure, has criticized the "sound discretion of the trial court" standard, arguing that the admission of evidence is strictly governed by the Tennessee Rules of Evidence. Donald F. Paine, Evidentiary Nonsense, Tenn. Bar Journal, June 2005, at 15.

App. 1995), this court discussed the standard of review on appeal after a determination of relevancy:

> "Because an assessment of whether a piece of evidence is relevant requires an understanding of the case's theory and other evidence as well as a familiarity with the evidence in question, appellate courts give great deference to a trial judge's decision on relevance issues. Often it is stated that a trial court's decision on relevance will be reversed only for an abuse of discretion. . . ."

918 S.W.2d at 449 (quoting Neil P. Cohen et. al., Tennessee Law of Evidence § 401.5 (2d ed. 1990)).

Tennessee Rule of Evidence 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403.

Here, Ms. Garrett testified that the defendant had his teeth filed in preparation to get gold teeth. Ms. Monger, the defendant's girlfriend, confirmed that the defendant had inscriptions on his new gold teeth, namely his initials "A" and "B" and a dollar sign. The defendant concedes the relevance of the defendant's use of the stolen funds for dental work but argues that the testimony regarding the inscriptions on the teeth is not relevant. The trial court held that the testimony was relevant to show the defendant's "full, knowing, and willing participation in [the crime]."

That the defendant went to a dentist within twenty-four hours after the robbery and obtained gold fillings is relevant to show that the proceeds of the robbery were used to finance his teeth. The evidence may have been marginally relevant to fully demonstrate the defendant's intent for his participation in the felony murder. The defendant's claim that the testimony was cumulative is inaccurate because Ms. Monger provided the only testimony on this subject. Further, even if the admission of the evidence was error, it was harmless in light of the fact that the defendant had earlier in the trial displayed his teeth to the jury. Tenn. R. App. P. 36(b).

### IV.

The defendant's final argument is that the trial court erred by allowing the state to bolster the medical examiner's credibility by testifying about his naval experience with regard to aircraft mishaps. The state contends that the trial court properly exercised its discretion in ruling that the doctor's military service was part of his background that could be presented to the jury.

The need for expert testimony and the qualifications of the expert are governed by Rule 702 of the Tennessee Rules of Evidence. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn.

1997). Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. The courts of this state have repeatedly held that "[q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court, whose ruling will not be overturned in the absence of abuse or arbitrary exercise of discretion." State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997); see State v. Thomas, 158 S.W.3d 361, 415 (Tenn. 2005); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); State v. Spratt, 31 S.W.3d 587, 603 (Tenn. Crim. App. 2000).

During his testimony outlining his qualifications as an expert in the fields of forensic pathology, anatomical pathology, clinical pathology, and forensic firearms, Dr. Smith stated that he was a captain in the medical corps of the U.S. Navy. He explained that most of his work in the Navy was related to aircraft mishaps and that he would try to "[correlate] the injury pattern that is seen in either the dead individual or the living individual with the changes to the aircraft as a result of the crash." The state argued at trial that the testimony was relevant to show the doctor's experience with making determinations of death. The defendant objected to the testimony and asserted that it was irrelevant. The trial court held that the doctor's "entire professional training and background [were] relevant in establishing his level of expertise, and that training and background would, and properly should, include the training and background, and experience he has had working as a captain with the U.S. Navy." The experiences were relevant to his degree of expertise in determining causes of death. In our view, the trial court did not abuse its discretion by allowing the doctor to testify regarding his military experience as a physician.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE