FILED
07/15/2021
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 2, 2021 Session

## STATE OF TENNESSEE v. IVIN LEE ROBINSON

**Appeal from the Circuit Court for Gibson County**
**No. H-9159   Clayburn Peeples, Judge**

_____

### No. W2020-00246-CCA-R3-CD

_____

The Gibson County Grand Jury indicted the Defendant, Ivin Lee Robinson, for first degree premeditated murder in Count 1, first degree felony murder in Count 2, and especially aggravated robbery in Count 3.[1]  Immediately prior to trial, the Defendant entered an "open" guilty plea to the especially aggravated robbery charge in Count 3, with the trial court to determine the appropriate sentence for this conviction at a later sentencing hearing. See Tenn. Code Ann. § 39-13-403.  Following a jury trial, the Defendant was convicted of the lesser included offense of second degree murder in both Count 1 and Count 2.  See id. § 39-13-210(a)(1).  Thereafter, the trial court merged the two second degree murder convictions, imposed a forty-year sentence in Count 1, imposed a forty-year sentence for the especially aggravated robbery conviction in Count 3, and ordered these sentences served consecutively for an effective sentence of eighty years at one hundred percent release eligibility.  On appeal, the Defendant argues:  (1) the evidence is insufficient to establish causation for his second degree murder convictions; (2) the trial court erred in failing to instruct the jury on reckless homicide and criminally negligent homicide as lesser included offenses of the felony murder charge; and (3) the trial court abused its discretion in imposing consecutive sentencing.  After review, we remand the case for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion.  In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS JR., and J. ROSS DYER, JJ., joined.

Alexander D. Camp, Jackson, Tennessee, for the Defendant-Appellant, Ivin Lee Robinson.

---

[1] Although the Defendant was indicted with codefendant Jacquita Ingram, Ingram's case was severed, and she testified as a witness for the State at the Defendant's trial.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Garry Brown, District Attorney General; and Jason Scott and Hillary Parham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial**. After the jury was selected but before the jury was sworn[2] or any proof was presented at trial, the Defendant, Ivin Lee Robinson, indicated his desire to enter an "open" guilty plea to the charge of especially aggravated robbery in Count 3. After the trial court informed the Defendant of the rights he would be waiving if he entered this guilty plea, the State provided the following factual basis in support of the Defendant's guilty plea:

> Your Honor, on or about December 27th, 2010, Mr. James Sims[, the victim,] lived at the address 2820 North Central Avenue. That night he called 911, was transferred to the Humboldt Police Department, told them he had just been robbed. He said he had been robbed by two black males and a black female. He didn't mention being shot, but it turns out when they responded to the scene[, the victim] had been shot four times with a small caliber weapon. He went to the hospital for a period of time. Came home for a couple of days, had to go back to the hospital and approximately six weeks later died, the immediate cause of death being a stroke. The medical examiner's opinion was that it was as a result of complications of chronic conditions due to multiple gunshot wounds. His opinion of the manner of death was a homicide.

> Your Honor, investigation ultimately led to a set of facts. The State would expect to prove that on that day that multiple people went to [the victim's] home with the intent of committing a robbery and theft there. Their plan was that the females who accompanied them, being Cymone Martin and Jacquita Ingram, were to get [the victim] to come to the door, get him to let them inside and then the males who were present, one of which was [the Defendant]—there was also a Travis Robinson there. We believe the proof will show that a Michael Epperson [was present also]—but once the girls got inside and had [the victim] preoccupied, that they would leave the door unlocked, the other gentlemen would go inside and . . . steal the items that were there and [the victim] would not be any wiser.

---

[2] Defense counsel stated that the Defendant waived any double jeopardy issues associated with entering his plea prior to the jury being sworn.

Ultimately, they failed to get [the victim] to let them in on their first try. Jacquita Ingram then went up there and told him she had money to buy a car. He was a used car dealer at the time. He let Jacquita Ingram in the house and once she was inside the doorway the males, with [the Defendant] being first, then rushed in the house. [The victim] tried to keep them out by physically putting his hands on Jacquita Ingram. The Defendant pulled a weapon and shot [the victim] at that time one time. They restrained [the victim] with . . . an extension cord and then proceeded to steal items of personal property from the house, including, among other things, a rifle and a shotgun and some coins; various things like that.

The testimony of Jacquita Ingram will be that as they were getting ready to leave the house with [the victim] still alive, conscious and tied up with the extension cord, that there was a conversation between [the Defendant] and Jacquita Ingram about whether or not [the victim] had seen their faces. Jacquita Ingram said that she then went outside, leaving [the Defendant] and the [victim] alone in the home and she heard what she described as two or three more gunshots.

We believe the medical proof will show that ultimately three bullets were removed from [the victim] upon the initial surgery and that after his death another bullet was removed from his buttock by the medical examiner and that all of those bullets matched what we deem to be the murder weapon and the proof will show that [the murder weapon] had been in the hands of [the Defendant] and later sold to another middle man.

The Defendant, through counsel, agreed that the State's factual recitation was substantially correct. The Defendant acknowledged that he "shot" the victim and "shot him more than one time and he robbed him." However, defense counsel said that "[w]ho all was in the house, whether or not they left the house and went back in, there's some variation about that." After determining that there was factual basis for the Defendant's plea, the trial court held that the Defendant's guilty plea to especially aggravated robbery was "voluntary and knowingly entered on the advice of a competent attorney" with whom the Defendant was satisfied. The court stated that it was finding the Defendant guilty of this offense and that it would sentence him for this conviction at a sentencing hearing following the conclusion of trial. Once the jury returned to the courtroom, the trial court informed the jurors of the Defendant's plea, stating:

[T]he Defendant during the noon break entered a plea to Count Three of the Indictment, wherein he is charged with especially aggravated robbery. He

- 3 -

entered a plea to that count only. He still has entered pleas of not guilty to the first two counts and it is upon those counts that he will be tried this week.

Evidence presented at trial showed that the victim, James Sims, was eighty years old when the December 27, 2010 offenses in this case occurred. The victim had a small used car lot on his property. On the afternoon of December 27, Jacquita Ingram drove the following five individuals to the victim's property: the Defendant, Ivin Robinson; Travis Robinson; Michael Epperson; and two females, Cymone Martin and Gabrielle Fenner. The group's plan was for the women to distract the victim by seducing him or by feigning interest in purchasing a car and then leave the victim's door open while the Defendant and the two other men entered the home to steal property.

Cymone Martin and Gabrielle Fenner knocked on the victim's back door, but they were unable to gain entry and returned to Ingram's car. Then Ingram, Martin, and Fenner all returned to the victim's home. Ingram talked to the victim through the closed door about buying one of the victim's used cars, and Martin and Fenner walked back to Ingram's car. When Ingram claimed she had money to buy a car, the victim opened the door, and Ingram moved and stood inside the doorway. Moments later, the Defendant and the other two men suddenly appeared behind Ingram, and the victim reacted by grabbing Ingram and the Defendant by the neck and attempting to push them out of his home. At that point, the Defendant shot the victim at least once with his revolver, and when the victim fell to the floor, the Defendant, Ingram, and the two other men entered the victim's home and took several items of the victim's property, including buckets of change, guns, and a police scanner. The robbers also tied up the victim with an extension cord.

The Defendant was the last person to leave the victim's home. As Ingram was walking out of the victim's house, she told the Defendant to "come on," and the Defendant replied that the victim had seen their faces. Ingram said that this did not matter because the victim was old, and after Ingram left the victim's house, she heard three gunshots and then saw the Defendant exit the victim's home.

Thereafter, Ingram drove the Defendant and the other members of the group to a park where they divided the victim's property and split up. During this time, the victim was able to untie himself and call 9-1-1.

When the police arrived, they noticed that the victim had been shot, which he had not mentioned during the brief 9-1-1 call, and saw that the victim's home had been ransacked. The victim stated that a "[b]lack female subject met him at the door and that two black male subjects rushed into the home, tied him up with an extension cord, and put him in the utility room." The victim stated that "two 12-gauge shotguns" and "one [.]22

- 4 -

rifle" had been taken from his home during the incident. The officers called for an ambulance, and the victim was transported to the hospital.

Upon arriving at the hospital, the victim was treated for the gunshot wounds to his abdomen, left groin, right buttock, and left back. Three bullets were recovered from the victim's body during the course of his treatment. While at the hospital, physicians discovered that the victim had several underlying chronic conditions, including chronic kidney disease, renal failure, an enlarged heart, coronary artery disease, an enlarged liver, and pulmonary disease.

These gunshot wounds exacerbated the victim's underlying conditions and caused new complications. Nevertheless, the victim was released from the hospital on January 25, 2011, approximately one month after being shot. At the time of his release, the victim's condition was improving. However, three days after his release, the victim returned to the hospital upon having a stroke. The victim died in the hospital on February 16, 2011.

Dr. Miguel Laboy, the medical examiner, stated that the victim's cause of death was "complications and exacerbation of natural chronic disease after multiple gunshot wounds." He also stated that the victim's manner of death was "homicide." He noted that when the victim was hospitalized for his gunshot wounds, he underwent surgical repair to his bowel and "developed multiple complications, including a myocardial infarction, ischemic cardiomyopathy, congestive heart failure, respiratory failure, and acute renal failure." He said that although the victim had stabilized and had been released from the hospital approximately one month after being shot, the victim returned to the hospital just three days later upon having a stroke, and after several days in the hospital this second time, the victim died. Dr. Laboy said that the victim's autopsy revealed that the victim had suffered a stroke, had an enlarged heart with severe coronary artery disease, and had lungs that were congested and edematous, had an enlarged liver, and had a repaired small bowel because of one of the gunshot wounds. He said that during the autopsy, he recovered a small caliber bullet from the victim's left buttock, whose location was consistent with the victim being shot in the front of the body. He retained this bullet for the police.

Dr. Laboy acknowledged that the victim's discharge summary said that the victim had received gunshot wounds, that the bullets had been removed, and that the victim's wounds were healing. He also noted that the discharge summary stated that the victim had chronic kidney disease and chronic renal failure, which were present on the victim's admission to the hospital after being shot. However, Dr. Laboy asserted that with treatment, the chronic kidney disease and the chronic renal failure would not have been life-threatening. He also said that while the gunshot wounds did not create the blockage in the victim's heart, it did complicate the victim's natural diseases, which resulted in the blockage to the victim's heart. When defense counsel asked if the victim's trip to the

- 5 -

hospital for his gunshot wounds may have saved the victim's life because he received treatment for his heart and kidney problems, Dr. Laboy asserted that the victim actually suffered "complications due to the multiple gunshot wounds," which required different medical interventions.

Shortly after the crimes in this case occurred, the Defendant sold his gun, a Romo six-shot .22 long rifle revolver, to Nehemiah Jackson and Chris Emery for approximately $15 and "a dime bag of weed." When Jackson and Emery received this gun, there were five shells inside the revolver that had already been fired but no live rounds in it. Jackson and Emery first learned that this gun had been used in a crime when the Defendant tried to blame them for the offenses in this case. Jackson attempted to repair the revolver but was unable to fire it because the revolver was "rusty" and "there was a piece missing" from the gun. Approximately one week after the offenses in this case, the police received information that allowed them to locate Nehemiah Jackson and to recover the .22 caliber revolver used to shoot the victim as well as the three empty shell casings inside the revolver, which were in Jackson's possession. All four of these casings were shown to have been fired from the revolver the Defendant sold to Jackson. The police also recovered an empty shell casing from Jackson's jacket. In addition, the police found six live rounds with the revolver.

Dan Royse, a Forensic Scientist Supervisor over the Firearms Identification Unit of the National Crime Laboratory, stated he test fired the revolver found in Jackson's possession and examined the empty shell casings and live rounds found with this revolver. Royse stated that it took eighteen pounds of pressure to pull the trigger of this revolver, which was more than would be expected to fire a double action firearm but was consistent with the age and worn condition of this particular handgun. Next, Royse tried to fire six rounds of the same type of ammunition from the revolver but was only able to fire four rounds. He said that two of these rounds did not discharge because the revolver's hammer did not strike the rim of the bullet with sufficient force. Royse noted that two of the six live rounds that were found with this revolver had partial firing pin impressions, which indicated that someone had tried to fire them in the revolver but they never discharged. Royse further noted that two of the four empty shell casings recovered by police had double firing pin impressions, indicating that these shells had been struck once, did not discharge, were struck a second time, and then discharged. Royse said that the double firing pin impressions on the two empty shell casings were consistent with his findings when he test fired the revolver. He stated that both the live rounds and the empty shell casings that he examined were consistent in type, brand, and manufacturer and were all hollow point bullets, which are designed to produce a larger wound track. Lastly, Royse determined that the four empty shell casings recovered by the police had been fired by the revolver the Defendant sold to Jackson.

After talking to a confidential informant, the police discovered that the Defendant, Ingram, and Martin may have been involved in the crimes against the victim. Initially, all three denied any knowledge of the crimes. Several months after the incident, the Defendant admitted to police that he had seen the gun involved in this incident four or five months earlier when he was at a house on Calhoun Street. The Defendant acknowledged that he had "handled" this gun but that the person who actually had this gun was a "little short dude" aged "17 to 18" who "kind of look[ed] like a midget" and wore "hats all the time." Three days later, the Defendant gave a statement to police wherein he denied being involved in the crimes against the victim and claimed that he had never been to the victim's property. During this statement, the Defendant indicated that Epperson had been involved in the crimes against the victim. The Defendant also told the police that the two shotguns recovered from Ingram's property pursuant to an earlier search warrant had most likely come from the victim.

Darletha Walker, the Defendant's girlfriend at the time of this incident, testified that the Defendant told her he had shot the victim while trying to rob him with Ingram. Walker said the Defendant sent her a letter from jail telling her to inform his attorney that the Defendant had been with her the night of the crimes against the victim and asking her to get other people to provide similar statements. Walker said that she took this letter to the police.

Marshall Mills, the victim's son-in-law, stated that he had known the victim for forty-three years and that the victim, at eighty years old, had been very active prior to his death and had successfully lived on his own. Mills stated that the victim was not on oxygen and that he was not aware of the victim having any serious medical conditions.

The Defendant did not testify and did not present any witnesses on his behalf at trial.

At the conclusion of trial, the jury convicted the Defendant of the lesser included offense of second degree murder in both Count 1 and Count 2.

**Sentencing.** At the May 2, 2016 sentencing hearing, the State acknowledged that the convictions in Count 1 and Count 2 "would merge," and the defense conceded that the Defendant was a Range II offender. The Defendant then made an allocution, stating, "I apologize for what I done and I apologize to the family."

The trial court determined that no mitigating factors applied. However, it applied the following enhancement factors to all three convictions, namely that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; that the Defendant was a leader in the commission of an offense involving two (2) or more criminal actors; that the victim was

particularly vulnerable because of age; that the Defendant treated, or the allowed the victim to be treated, with exceptional cruelty during the commission of the offense; and that the Defendant had no hesitation about committing a crime when the risk to human life was high. See id. §§ 40-35-114(1), (2), (4), (5), (10). The trial court merged Counts 1 and 2. It then imposed the maximum sentence of forty years in Count 1 and Count 3.

After considering the Defendant's criminal history, which included three Class C felonies, four Class D felonies, and a Class E felony, the trial court determined that the two forty-year sentences in Count 1 and Count 3 would be served consecutively. However, the court's findings regarding consecutive sentencing were limited to the following:

> I do find that the Defendant is an offender whose record of criminal activity is extensive. I do find him to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk of human life is high.

The judgments of conviction were filed on May 31, 2016.[3] Thereafter, the Defendant filed a timely motion for new trial, alleging in pertinent part that the evidence was insufficient to sustain his convictions for second degree murder and that the trial court erred in ordering his sentences for second degree murder and especially aggravated robbery served consecutively to one another. He subsequently filed an amended motion for new trial, additionally alleging in part that the trial court erred in failing to instruct the jury of the lesser included offenses of reckless homicide and criminally negligent homicide in Count 2 and that the State failed to prove that the victim's death was proximately caused by the Defendant's actions. Following a hearing, the trial court entered a written order denying the motion for new trial on February 13, 2020. Thereafter, the Defendant filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his second degree murder convictions because the State failed to prove that his conduct caused the victim's death. He claims that the eighty-year-old victim's "life threatening health problems" actually caused the victim's death and that the victim was "on track to recover from the gunshot wounds had he not suffered from his other natural diseases." The State responds that the Defendant likely waived this issue by failing to cite any legal authority in support of this argument. See Tenn. Ct. Crim. App. R.

---

[3] On August 9, 2016, the trial court entered a corrected judgment for the Defendant's especially aggravated robbery conviction in Count 3, reflecting that the release eligibility for this conviction was one hundred percent pursuant to Code section 40-35-501(I)(2)(E).

10(b); Tenn. R. App. P. 27(a)(7). Alternatively, the State maintains that it presented abundant proof supporting the jury's finding that the Defendant caused the victim's death. We agree with the State that the Defendant has waived this issue by failing to cite to supporting legal authority. See id. Waiver notwithstanding, we conclude that the evidence not only is sufficient to establish that the Defendant caused the victim's death but also is sufficient to sustain the Defendant's second degree murder conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Second degree murder is defined as "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210(a)(1), and is a result-of-conduct offense, State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015). As relevant in this case, a person acts knowingly "when the person is

aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); see id. § 39-11-301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). Accordingly, a "knowing" killing is one in which the person is aware that the conduct is reasonably certain to cause death. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). "[T]he proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused 'knew that his or her actions were reasonably certain to cause the victim's death.'" State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011) (quoting State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010)). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000). A jury may infer that a defendant acted knowingly from the surrounding facts and circumstances. Brown, 311 S.W.3d at 432; see Inlow, 52 S.W.3d at 105 ("Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.").

In order to sustain a conviction for second degree murder, the proof must establish that the defendant's action or conduct caused the victim's death. "[C]ausation is an essential element of every homicide offense[.]" State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). Such proximate causation "is generally established in Tennessee by showing that the victim's death was the natural and probable result of the defendant's unlawful conduct." Id. at 203. However, "[t]he defendant's unlawful act . . . need not be the sole or immediate cause of the victim's death." Id. (citing Letner v. State, 299 S.W. 1049, 1051 (Tenn. 1927)); see State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982). "'It is only necessary that the defendant unlawfully contributed to the death of the deceased.'" State v. Richardson, 995 S.W.2d 119, 125 (Tenn. Crim. App. 1998) (quoting Roberson, 644 S.W.2d at 698). Causation in a criminal case is a question of fact to be determined by the jury based on the evidence presented at trial. Farner, 66 S.W.3d at 204. Consequently, "a jury's determination of the causation issue will be reviewed under the familiar sufficiency of the evidence standard and will not be disturbed by an appellate court so long as the evidence is sufficient to support the jury's determination." Id.

In this case, the trial court provided the following instruction to the jury regarding cause of death:

> Now, before the Defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the Defendant. The proximate cause of a death is that cause which in natural and continuous sequence, unbroken by any independent intervening cause produces the death and without which the death would not have occurred.

The Defendant's conduct need not be the sole or immediate cause of death. The acts or omissions of two or more person[s] may work concurrently to proximately cause a death in such a case each of the participating acts or omissions is regarded as a proximate cause. It is not a defense that the negligent conduct of the deceased may also have been a proximate cause of the death.

However, it is a defense to homicide if the proof shows that the death was caused by an independent intervening act [o]f the deceased or another which the Defendant in the ordinary care could not have reasonably anticipated as likely to happen. However, if in the exercise of ordinary care the Defendant should reasonably have anticipated the intervening cause, that cause does not supersede the Defendant's original conduct and the Defendant's conduct is considered the proximate cause of death. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death fall within the general field of danger which the Defendant should have reasonably anticipated.

If some other circumstance caused the Defendant's death unrelated to the Defendant's action, that would be a defense to homicide unless the circumstance was a natural result of the Defendant's act.

If you find the Defendant's acts, if any, did not unlawfully cause or contribute to the death of the deceased or if you have a reasonable doubt as to this proposition, then you must find him not guilty of causing that death.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.14. The record shows that the jury was properly instructed on causation as a necessary element of homicide.

Here, the Defendant insists that because the victim was in poor health, had several chronic conditions, and was released from the hospital and lived for nearly two months following the shooting, the evidence fails to prove beyond a reasonable doubt that the gunshots wounds he inflicted were the cause of the victims' death, especially given the medical examiner's acknowledgment that the victim's gunshot wounds were healing at the time he was discharged from the hospital.

Despite the Defendant's claims, we conclude that the evidence, when viewed in a light most favorable to the State, establishes that the Defendant's conduct caused the victim's death. Prior to trial, the Defendant pled guilty to especially aggravated robbery, and the proof at trial showed that the Defendant shot the victim a total of four times after

forcing his way into the victim's home during the robbery. Dr. Laboy, the medical examiner, provided unrefuted testimony that the victim's death was caused by complications from and the exacerbation of the victim's natural chronic disease after receiving multiple gunshot wounds. The jury, by its verdict, rejected the Defendant's claim that he was not responsible for the victim's death.

Because the record shows that the victim's death was the natural and probable result of the Defendant's unlawful conduct, we conclude that evidence is sufficient to support the jury's finding that the Defendant caused the victim's death. See, e.g., State v. Thomas, 158 S.W.3d 361, 389 (Tenn. 2005) (appendix) (holding that the evidence was sufficient to establish causation where both medical examiners testified to the injuries sustained by the victim from an April 21, 1997 gunshot wound to the head and the impact of these injuries during the intervening period until the victim died of sepsis on October 2, 1999); State v. Barnes, 703 S.W.2d 611, 615 (Tenn. 1985) (concluding that the death of the ninety-one-year-old female victim, who died of sepsis from pneumonia seventeen days after being taken to a hospital, was directly caused by the severe beating she received from the defendant); Roberson, 644 S.W.2d at 698 (holding that the State had proved beyond a reasonable doubt that the victim's death was caused by the defendant's unlawful acts when the proof showed that the victim died from pneumonia approximately three weeks after being beaten and the victim's susceptibility to the pneumonia and his inability to fight it "were related to the severe beating he received from the defendant").

In concluding that the evidence is sufficient to establish causation, we reiterate that the defendant's conduct need not be the sole cause of the victim's death and that a conviction will be upheld if the defendant unlawfully contributed to the victim's death. See id. Based on the evidence presented at trial, a rational jury could have found that the Defendant unlawfully contributed to the victim's death when he shot the victim multiple times. Because the trial transcript shows that victim's death was the natural and probable result of the Defendant's unlawful acts, we conclude that the evidence is sufficient to establish that the Defendant's conduct proximately caused the victim's death. Although the Defendant only raises the causation issue and does not otherwise challenge the sufficiency of the proof offered at trial, we nevertheless conclude that the evidence is sufficient to sustain both of the Defendant's second degree murder convictions.

**II. Lesser Included Offenses.** The Defendant maintains that the trial court erred in failing to instruct the jury on reckless homicide and criminally negligent homicide as lesser included offenses of felony murder.[4] See State v. Ely, 48 S.W.3d 710, 721 (Tenn.

---

[4] Although the Defendant initially asserts that the trial court should have instructed the jury for the felony murder count on "attempted first-degree murder, attempted second-degree murder, voluntary manslaughter, attempted voluntary manslaughter, reckless homicide, and criminally negligent homicide," he abandons this claim, providing only detailed argument and legal support for the contention that the trial

2001) (holding that second degree murder, reckless homicide, and criminally negligent homicide are lesser included offenses of felony murder). He claims that the proof presented at trial regarding his alleged conduct toward the victim warranted instructions on these lesser offenses. The State counters that instructions on these lesser included offenses were not justified by the evidence in this case and that when the trial court instructed the jury on reckless homicide and criminally negligent homicide with respect to the first degree premeditated murder charge, the jury still found the Defendant guilty of second degree murder. Alternatively, the State maintains that even if the trial court committed error in failing to instruct on these lesser included offenses, any such error was harmless. We conclude that the Defendant has waived this issue by failing to file a written request for these specific instructions and that the court's failure to instruct on these lesser included offenses does not rise to the level of plain error.

Here, the Defendant contends that the proof presented at trial warranted instructions on reckless homicide and criminally negligent homicide because the evidence showed that he struggled with the victim before recklessly or negligently shooting the victim with his .22 pistol. The Defendant asserts that an average person engaging in such conduct would be aware of the "substantial and unjustifiable risk that [death] will occur." Tenn. Code Ann. § 39-11-302(c), (d). He claims that if the jury believed that he was aware of, but consciously disregarded such a risk, it could have convicted him of reckless homicide. See id. §§ 39-13-215(a), 39-11-106(a)(33), -302(c). He also claims that if the jury believed he was not aware but should have been aware of such a risk, it could have convicted him of criminally negligent homicide. See id. §§ 39-13-212(a), 39-11-106(a)(5), -302(d).

Initially, we note that Tennessee Code Annotated section 40-18-110 requires all defendants to make a written request regarding the specific lesser included offenses on which a jury instruction is sought:

> (a) When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without

court erred in failing to instruct on reckless homicide and criminal negligent homicide. Because the Defendant has waived our consideration of the broader issue, we limit our analysis to whether the trial court should have instructed the jury on reckless homicide and criminal negligent homicide with regard to Count 2. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

(b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge.

(c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

Id. § 40-18-110(a)-(c) (Supp. 2015) (emphases added). Pursuant to this statute, a defendant may not present an issue on appeal regarding the failure to instruct on a lesser included offense unless he or she files a written request "specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought[.]" Id. § 40-18-110(b).

Here, prior to trial, the Defendant made a very general written request for "all lesser included offenses in this case" but failed to specifically identify the particular lesser included offenses on which a jury instruction was sought. See id. At trial, the Defendant made an oral request for the lesser included offense of second degree murder as well as "the lessers on second" with respect to the felony murder count. However, because neither an oral request or the Defendant's vague written request is sufficient to preserve this issue for plenary review, the issue is waived on appeal unless it constitutes plain error. See State v. Perrier, 536 S.W.3d 388, 405 (Tenn. 2017) (acknowledging that the issue was waived because trial counsel failed to submit a written request for an instruction on the lesser included offense of possession of a firearm during the commission of a dangerous felony); State v. Martin, 505 S.W.3d 492, 503 (Tenn. 2016) (concluding that the issue was waived when the defendant orally requested a jury instruction for a particular lesser included offense but failed to make a written request); State v. Fayne, 451 S.W.3d 362, 371 (Tenn. 2014) (holding that the issue was waived because the defendant failed to make a written request for a specific instruction on any lesser included offenses as required by Code section 40-18-110(a)-(c)); State v. Page, 184 S.W.3d 223, 230 (Tenn. 2006) (concluding that the defendant's failure to request a lesser included offense instruction waived plenary review and that the failure to instruct on this lesser included offense did not rise to the level of plain error). We note that the Defendant in this case never acknowledged that he had waived this issue and never requested plain error review.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

We conclude that the trial court's failure to instruct on reckless homicide and criminally negligent homicide does not rise to the level of plain error because a substantial right of the accused was not adversely affected and because consideration of the error is not necessary to do substantial justice. Here, the Defendant entered a guilty plea to especially aggravated robbery at the beginning of trial, and the jury was informed of this plea. During opening statements, the defense admitted that the Defendant shot the victim during the robbery, that the victim "was shot in the extremities and tied up," and that the Defendant "committed a terrible crime." The defense theory at trial was that the gunshots wounds inflicted by the Defendant did not cause the victim's death and that the killing was not premeditated.[5] The proof showed that the Defendant shot the victim four times; the Defendant shot the victim at least one time when he forced his way into the victim's home; and the Defendant shot the victim three more times before leaving to ensure that the victim would not identify him to the police. During closing statements, the defense acknowledged that the Defendant fired the gun several times but argued, without any evidentiary support,

---

[5] We note that in this appeal, the Defendant argued, unsuccessfully, that the evidence was insufficient as to causation but never argued that the evidence was insufficient to establish that he acted "knowingly," which is the mens rea required for second degree murder.

- 15 -

that it was in response to a struggle with the victim; the defense also contended, again without any evidentiary support, that the Defendant believed that the victim had never been hit by these gunshots, which was why they tied the victim up. After considering the evidence presented at trial, the Defendant's defense theory, and the verdict returned by the jury in this case, we do not believe that the court's failure to instruct on reckless homicide and criminally negligent homicide constitutes plain error. See Martin, 505 S.W.3d at 506 (citing Moore v. State, 485 S.W.3d 411, 422 (Tenn. 2016)).

In reaching this decision, we recognize that the trial court properly charged the lesser included offenses of reckless homicide and criminally negligent homicide with respect to the premeditated murder count. We also note that the jury, with respect to the premeditated murder charge in Count 1, was instructed on the lesser included offenses of attempted first degree murder, second degree murder, attempted second degree murder, voluntary manslaughter, attempted voluntary manslaughter, reckless homicide, criminally negligent homicide, aggravated assault, and assault. Although the jury received instructions on the lesser included offenses of reckless homicide and criminally negligent homicide on the premeditated murder charge, the jury ultimately chose to convict the Defendant of second degree murder. Even if the jury had been instructed on reckless homicide and criminally negligent homicide with respect to the felony murder charge in Count 2, we do not believe the jury would have convicted the Defendant of these lesser included offenses in light of the verdict of second degree murder that was reached in Count 1.

The Defendant has simply not shown that the failure to charge reckless homicide or criminally negligent homicide "was an error of sufficient magnitude that it probably changed the outcome of trial." State v. Banks, 271 S.W.3d 90, 129 (Tenn. 2008). Because the trial court's failure to instruct on reckless homicide and criminally negligent homicide did not adversely affect a substantial right of the accused and because consideration of the error is not necessary to do substantial justice, the Defendant is not entitled to plain error relief.

**III. Consecutive Sentencing.** Lastly, the Defendant contends that the trial court erred in ordering him to serve his sentences consecutively and that his effective sentence of eighty years is "excessive." He asserts that as a thirty-seven-year-old who received an eighty-year sentence, he is looking at serving the remainder of his life in prison and that a concurrent sentence of forty years at one hundred percent would appropriately punish him for his crimes. The State responds that the trial court acted within its discretion in imposing consecutive sentencing and that the Defendant's extensive criminal history was "quite enough, on its own, to warrant consecutive sentencing." We agree with the State.

In Pollard, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing

determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court imposed consecutive sentencing after determining that the Defendant had an extensive record of criminal activity and was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(2), (4).

At the sentencing hearing, the trial court was informed that the Defendant's criminal history consisted of eight felonies, including three Class C felonies, four Class D felonies, and a Class E felony. Only two of these Class C felonies were needed to establish the Defendant's Range II status. See id. § 40-35-106(a)(1). The presentencing investigation report, which was made an exhibit to the sentencing hearing and considered by the trial court, shows that the Defendant's criminal history included a total of twenty-two convictions, with only three being misdemeanor convictions. See id. §§ 40-35-209, -210(b)(2); State v. Baker, 956 S.W.2d 8, 17 (Tenn. Crim. App. 1997) (stating that although "much of the information contained in a presentence report will be hearsay[,]" this information "is reliable because it is based upon the presentence officer's research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report"). Eight of these convictions were felonies committed by Defendant while a juvenile. See State v. Stockton, 733 S.W.2d 111, 112-13 (Tenn. Crim. App. 1986) ("[A] juvenile record of criminal conduct may properly be considered in assessing a suitable sentence upon a felony conviction by an adult."). Six of these prior convictions were for the violent offense of aggravated burglary. The record also shows that the Defendant, after committing the offenses against the victim in this case but before he was indicted for those crimes, committed an aggravated robbery in an

unrelated case. Accordingly, the Defendant's very extensive criminal record clearly establishes one of the grounds sufficient for imposing consecutive sentencing. See Tenn. Code Ann. § 40-35-115(b)(2).

As for the second ground the trial court applied, the Pollard court explained that two additional findings must be made when applying the dangerous offender classification:

> "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (alternation and emphasis in original) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The Defendant does not specifically raise this issue, but the record shows that while the trial court found that the Defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk of human life is high," the court never made the additional findings required for this classification, namely that the aggregate sentence is "reasonably related to the severity of the offenses committed" and "necessary in order to protect the public from further criminal acts."

Despite the trial court's failure to make these additional findings, the record fully supports the trial court's application of Code section 40-35-115(b)(2), that the Defendant is an offender whose record of criminal activity is extensive. Because only one ground is required to support the appropriateness of consecutive sentencing, we conclude the trial court did not abuse its discretion in ordering that the Defendant's sentence for his especially aggravated robbery conviction be served consecutively to his second degree murder conviction.

- 18 -

As a final note, we detect some clerical errors in the judgment forms that require correction. While Count 1 and Count 3 show that the especially aggravated robbery conviction in Count 3 is served "consecutively to" the second degree murder conviction in Count 1, the judgments form for Counts 1 and 2 in the Special Conditions box state only that "Counts 1 & 2 are merged," and the judgment form for Count 2 is incomplete in that it does not provide an offender status, release eligibility, or sentence for the second degree murder conviction that was presumably merged with the second degree murder conviction in Count 1. In other words, the trial court never sentenced the Defendant in Count 2 and never explicitly stated which conviction would be the greater or surviving conviction between Count 1 or Count 2 on the judgment forms. In a case such as this one, when two convictions merge, it is proper for the trial court to determine which conviction is the greater or surviving conviction. See State v. Berry, 503 S.W.3d 360, 364 (Tenn. 2015) (order for publication summarily granting the application of the defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the 'Special Conditions' box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the 'Special Conditions' box on the uniform judgment document for the greater or surviving conviction."). Therefore, we remand this case to the trial court for entry of corrected judgment forms in Count 1 and Count 2. On remand, the trial court should impose separate sentences for the convictions in Count 1 and Count 2; should place these sentences on separate, completed judgment forms; and should note in the "Special Conditions" box on each judgment form whether Count 1 or Count 2 is the greater or surviving conviction following merger. See id.

## CONCLUSION

The case is remanded for entry of corrected judgment forms in Counts 1 and 2 as specified in this opinion. In all other respects, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE